**CITIZENS CONCERNED ABOUT JET NOISE, INC., a Virginia non-stock corporation, Plaintiff,**

v.

**John H. DALTON, in his official capacity as Secretary of the Navy; and the United States of America, Defendants.**

**No. 2:98cv800.**

United States District Court,
E.D. Virginia,
Norfolk Division.

May 19, 1999.

Jack E. Ferrebee, Denton & Ferrebee, PLC, Virginia Beach, VA, for plaintiff.

Susan L. Watt, Assistant United States Attorney, Norfolk, VA, Geoffrey Garver, U.S. Department of Justice, Environment and Natural Resources Division, General Litigation Section, Washington, DC, Robert Smith, U.S. Department of the Navy, Navy Litigation Office, Washington, DC, for defendants.

### OPINION AND FINAL ORDER

REBECCA BEACH SMITH, District Judge.

This matter is before the court on cross-motions for summary judgment. For the reasons detailed herein, the court **GRANTS** defendants' motion for summary judgment and **DENIES** plaintiff's motion for summary judgment and permanent injunction.[1]

Plaintiff, Citizens Concerned About Jet Noise, Inc. ("CCAJN"), seeks to halt the transfer of 156 Navy F/A–18 "Hornet" aircraft from Naval Air Station ("NAS") Cecil Field to NAS Oceana, located in Virginia Beach, by challenging the adequacy of the Final Environmental Impact Study ("FEIS") produced by the Navy pursuant to the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C.A. §§ 4321–70d. The court has federal question jurisdiction over this NEPA action under 28 U.S.C. § 1331.

### I. Factual Background

CCAJN is a Virginia non-stock corporation comprised of Virginia Beach and Chesapeake residents who live in the vicinity of NAS Oceana and Naval Auxiliary Landing Field ("NALF") Fentress. NAS Oceana is a designated Master Jet Base located within the corporate limits of Virginia Beach. NALF Fentress is located in the city of Chesapeake and is an auxiliary airfield used by Navy aircraft to practice carrier landings prior to overseas deployments aboard aircraft carriers.[2] The

---

1. At the hearing on the motions for summary judgment and permanent injunction, the court also heard evidence and argument on plaintiff's motion for a preliminary injunction. The court denied the motion for preliminary injunction at the conclusion of the hearing.

2. NALF Fentress is used by aircraft based at NAS Oceana and NAS Norfolk.

members of CCAJN are residents of Virginia Beach and Chesapeake who live within the accident potential zones and noise corridors surrounding NAS Oceana and NALF Fentress. Although the corporation name specifically refers to "jet noise," the group's concerns are much broader, encompassing safety, air quality, economic and educational impacts, and property values, all of which were addressed in the challenge to the FEIS.

The origins of the FEIS challenged in this action date back to 1990. In that year, as part of the National Defense Authorization Act for fiscal year 1991, Congress passed the Defense Base Realignment and Closure Act of 1990 ("Base Closure Act"), Pub.L. No. 101–510 tit. 29, part A, §§ 2901 to 2910, 104 Stat. 1485, 1808–19, as amended (contained in 10 U.S.C. § 2687 statutory notes), which provided a mechanism for identifying and authorizing the closure of military bases. The Base Closure Act established an eight-man Base Realignment and Closure ("BRAC") Commission to spearhead the closure process. The BRAC Commission received the closure recommendations made by each service branch, and, after reviewing those recommendations, made independent recommendations regarding the bases that should be closed. The BRAC Commission transmitted its recommendations to the President, who had only two options. The President could approve the entire BRAC report and send it on to Congress, or reject the report, thereby terminating the closure process for that cycle.

Once received from the President, Congress could either accept or reject the BRAC report in its entirety. If Congress did not reject the BRAC report within forty-five days, the Base Closure Act directed the Secretary of Defense to carry out all of the closure and realignment decisions in the BRAC report. In other words, if not rejected by Congress, the BRAC report became binding law on the Secretary of Defense. The Base Closure Act also mandated that realignment and closure actions be initiated within two years of the date the BRAC report was sent to Congress by the President, and that all closures and realignments be completed within six years of that date. The Base Closure Act mandated that the entire process be repeated three times, with the Commission's recommendations due to the President in 1991, 1993, and 1995.

Under the 1993 BRAC report, approved by both the President and Congress, the Secretary of Defense was directed to close the Master Jet Base at NAS Cecil Field, outside of Jacksonville, Florida, and distribute the air assets from NAS Cecil Field to other bases. The 1993 report specifically directed that the Navy transfer all of the F/A–18 aircraft at NAS Cecil Field to Marine Corps Air Station ("MCAS") Cherry Point, North Carolina. Two years later, however, in the 1995 BRAC report, that decision was changed. The 1995 BRAC report redirected the F/A–18 aircraft to "other naval air stations, primarily [NAS], Oceana, Virginia; [MCAS], Beaufort, South Carolina; [NAS] Jacksonville, Florida, and [NAS] Atlanta, Georgia; or other Navy or Marine Corps Air Stations with the necessary capacity and support infrastructure." Defense Base Closure and Realignment Commission, 1995 Report to the President, at 1–50. Not only was MCAS Cherry Point not even listed as a "primary" receiving site, but the 1995 BRAC report also did not delineate the new location of the F/A–18s, leaving that decision to be made by the Navy. The 1995 BRAC report became binding law after its recommendations were accepted by both the President and Congress.

The 1995 BRAC Commission redirected the F/A–18s because "the accelerated retirement of the A–6E aircraft at NAS Oceana creates a vacancy in existing facilities. This redirect *uses this capacity* and avoids substantial new construction at MCAS Cherry Point, North Carolina." *Id.* (emphasis added). This reasoning

tracks with the justification offered by the Department of Defense ("DOD"), which requested the redirect in order to avoid adding to existing excess capacity. Thus, between the DOD and the BRAC Commission, it is clear that the overriding concern of the 1995 BRAC recommendation was to use the excess capacity already in existence, especially at NAS Oceana, before building new and extensive facilities at an air station without substantial excess capacity.

The 180 F/A–18s stationed at NAS Cecil Field are assigned to eleven fleet squadrons (twelve aircraft per squadron) and one Fleet Replacement Squadron ("FRS") (forty-eight aircraft squadron). The FRS trains new pilots in the F/A–18 aircraft before the pilots are assigned to fleet squadrons. The fleet squadrons deploy aboard aircraft carriers homeported in Norfolk, Virginia, and Mayport, Florida. These carriers deploy in the Atlantic Ocean and Mediterranean Sea for six-month periods. Prior to these extended deployments, the carriers and their complements of aircraft conduct training in operational areas off the Atlantic seaboard. In addition, when not deployed aboard the carriers, the F/A–18 squadrons are required to maintain a rigorous training schedule that requires training areas for air-to-air and air-to-ground operations, as well as airfields for practicing carrier landings prior to deployments. The aircraft also have periodic maintenance requirements that cannot be met by the squadron maintenance personnel, but, instead, must occur at an Aviation Intermediate Maintenance Depot ("AIMD").

With these operational considerations in mind, the Navy developed screening criteria designed to satisfy the 1995 BRAC mandate that the F/A–18s be transferred to stations with the "necessary capacity and infrastructure." FEIS at 2.1–1. The capacity analysis paralleled the methodology of the BRAC process by focusing on available aircraft hangar modules as the main indicator of excess capacity at a particular airfield. Id. at 2.1–2. The Navy's infrastructure analysis evaluated the runway capacity (number and length), as well as maintenance, training, and other support infrastructure at each base. Id. at 2.2–1 to 2.1–6. Finally, the operational analysis accounted for the myriad of F/A–18 training requirements, including access to training ranges within 100 miles of the receiving installation, airspace availability, access to auxiliary fields within fifty miles of the receiving installation for Field Carrier Landing Practice ("FCLP"), and other combat readiness criteria. Id. at 2.2–7 to 2.2–10.

After applying these screening criteria to twenty eastern seaboard Navy and Marine Corps Air Stations, the Navy determined that only three, NAS Oceana, MCAS Cherry Point, and MCAS Beaufort, had sufficient excess capacity and the necessary infrastructure to support F/A–18s. Id. at 2.1–12. Following a total of seven public "scoping" meetings, the Draft Environmental Impact Statement ("DEIS") was distributed on September 19, 1997.

The draft identified five Alternative Realignment Scenarios ("ARSs") that were under consideration. ARS 1, the only single-site alternative developed, placed all of the aircraft at NAS Oceana. ARS 2 maximized use of existing capacity at two air stations by placing nine squadrons and the FRS at NAS Oceana and two squadrons at MCAS Beaufort. ARS 3 also maximized use of existing capacity at two air stations by placing eight squadrons and the FRS at NAS Oceana and three squadrons at MCAS Cherry Point. ARS 4 placed five squadrons at MCAS Beaufort, requiring an expansion in capacity, and six squadrons plus the FRS at NAS Oceana, which utilized all the capacity there. ARS 5 placed five squadrons at MCAS Cherry Point, also requiring an expansion in capacity, and six squadrons and the FRS to NAS Oceana, again using all existing capacity. ARS 5 was identified in the Record of Decision ("ROD") as the "environmentally preferred alternative."

588

Seven public hearings were held on the DEIS and public comment was accepted through December 2, 1997. In light of the comments received, the Navy made a number of changes to the DEIS and made the FEIS available for public comment on March 20, 1998. The FEIS identified ARS 1 as the Navy's preferred alternative, primarily for operational reasons related to the Navy's national defense mission. The comment period was held open for thirty days, until April 20, 1998. On May 18, 1998, the ROD selected ARS 2, which sent nine squadrons and the FRS to NAS Oceana, and two squadrons to MCAS Beaufort.

In accordance with the Base Closure Act, preparations to close NAS Cecil Field had already begun by the time the 1995 BRAC report changed the receiving site for the F/A–18s from MCAS Cherry Point to a new location selected by the Navy. Because NAS Cecil Field was first selected for closure in the 1993 BRAC report, the six-year deadline expires at the end of fiscal year 1999, and most, if not all, funding for the base ceases after that time. Preparations to close NAS Cecil Field continued during the Navy's selection process of a new receiving site for the F/A–18s. Because the F/A–18 relocation must be completed less than two years after the ROD was issued, the Navy moved quickly to implement the decision. In fact, in their briefs before the court, both parties agree that the first contract for new construction at NAS Oceana was awarded on the same day the ROD was signed, with two more contracts following soon thereafter. On December 4, 1998, the first two squadrons of aircraft flew into NAS Oceana. The remaining squadrons are scheduled to move to NAS Oceana during 1999, either directly or upon return from a six-month fleet deployment.[3]

Plaintiff filed this lawsuit on July 15, 1998, requesting permanent injunctive re-lief. On November 24, 1998, plaintiff filed a motion with the court for a preliminary injunction and also for summary judgment. In response, defendants also moved for summary judgment, and, following full briefing on the issues, a hearing was held before the court on January 13, 1999.

## II. The NEPA Framework and Standard of Review

■ NEPA does not impose any substantive requirements on federal agencies. Instead, NEPA is only a procedural mechanism that serves to ensure the agency "considered environmental concerns in its decision making process." *Baltimore Gas & Electric Co. v. NRDC*, 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). NEPA does this by requiring preparation of an environmental impact statement ("EIS") for any major federal action that significantly affects the quality of the "human environment." 42 U.S.C. § 4332(2)(c). The "heart" of the EIS is the alternatives analysis, which "should present the environmental impacts of the proposal and the alternatives in comparative form." 40 C.F.R. § 1502.14. The regulations require the agency to "evaluate all reasonable alternatives" and discuss the reasons for the elimination of alternatives from the study, *id.* at § 1502.14(a), as well as mitigation efforts related to each alternative. *Id.* at § 1502.14(f). The agency is then required to describe the affected environment in sufficient detail "to understand the effects of the alternatives." *Id.* at § 1502.15. Finally, 40 C.F.R. § 1502.16 requires the agency to conduct a detailed examination of the environmental consequences on the affected environment, including direct and indirect effects and their significance, the environmental effects of the alternatives, and mitigation measures to the extent they were not covered under the alternatives analysis.

■ Significantly, the Supreme Court has held that the NEPA process does not

**3.** A number of squadrons will not be arriving at NAS Oceana until the year 2000, but these are squadrons that are returning from deploy-ments begun in 1999. The fact remains that essentially all F/A–18 aircraft will have left NAS Cecil Field by the end of 1999.

mandate a particular outcome, but only describes the process necessary to reach an informed decision. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350–51, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). In fact, "[i]f the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Id.* at 350, 109 S.Ct. 1835. In other words, the agency is free to take the most environmentally costly course of action or alternative, so long as the environmental impact is fully identified in the EIS and the agency determines that "other values" outweigh the impact on the environment. Moreover, the NEPA regulations clearly anticipate that an agency will have a preferred alternative, perhaps even a specific proposal, going into the EIS process. *See* 40 C.F.R. § 1502.2(g) (stating that an EIS "serve[s] as the means of assessing the environmental impact of *proposed* agency actions, rather than justifying decisions already made") (emphasis added); *id.* at § 1502.4(a) ("Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement.").

An agency's decision may be based on "factors including economic and technical considerations and agency statutory. missions," as well as "any essential considerations of national policy which were balanced by the agency." *Id.* at § 1505.2(b). The agency must also evaluate "reasonably foreseeable significant adverse effects on the human environment," which are known as the cumulative impacts. *Id.* at §§ 1502.22 and 1508.7 (latter section defining cumulative impact as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency ... or person undertakes such other actions").

The standard for judicial review is whether the agency decision, in view of the FEIS, was arbitrary and capricious, an abuse of discretion, or not in accordance with the law. *Fayetteville Area Chamber of Commerce v. Volpe,* 515 F.2d 1021, 1024 (4th Cir.1975). The Fourth Circuit has also emphasized the Supreme Court's admonition that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (quoted in *Fayetteville Area Chamber of Commerce,* 515 F.2d at 1024).

### III. Discussion

In support of its motion for summary judgment, plaintiff makes numerous arguments challenging the reasonableness and adequacy of the FEIS: (1) the alternatives analysis was inadequate because it did not consider other reasonable alternatives; (2) the noise analysis was not adequate because it did not fully assess the costs to the community from the higher noise levels associated with the F/A–18s; (3) the cost-benefit analysis also failed to account for costs to the community of private and public noise mitigation efforts that would be required under the analyzed ARSs; (4) the safety risk was not analyzed; (5) there were errors and omissions in the air quality analysis; (6) the FEIS failed to address practical mitigation measures with the potential to reduce the otherwise unavoidable adverse impact of jet noise at NAS Oceana; (7) the FEIS contained a flawed environmental justice analysis; and (8) the FEIS failed to address foreseeable adverse environmental impacts as required by NEPA by not addressing the cumulative impact of the future replacement of F–14 and F/A–18 C/D aircraft with the F/A–18 E/F. Finally, plaintiff also makes a general attack on the Navy's NEPA process, arguing that the Navy deliberately deceived the public through feigned compliance with NEPA's requirements.

From the briefs, case law, and an examination of the lengthy administrative record, however, the court finds that there is no basis in fact or law for plaintiff's arguments.

## A. The Navy's Interpretation of 1995 BRAC Commission Report

■ An important threshold question to be answered in this case concerns the Navy's interpretation of the 1995 BRAC law. The Navy rightly viewed the 1995 BRAC report as restricting the alternatives to be considered under the EIS. For example, the Navy obviously could not choose as an alternative the option of single-siting all F/A–18s at MCAS Cherry Point, which was the 1993 BRAC recommendation explicitly rejected by the 1995 BRAC report.

In developing the screening criteria used to winnow the field of potential recipient air stations, the Navy based those criteria on the 1995 BRAC recommendations, as well as important operational considerations, such as F/A–18 training and maintenance requirements. Significantly, although plaintiff challenges the Navy's use of NAS Oceana in every ARS, plaintiff does not challenge the selection criteria used by the Navy to winnow the list of twenty air stations down to three. In fact, at oral argument, plaintiff conceded that the Navy's use of these criteria was reasonable. In addition, the administrative record is clear that the screening criteria were developed in a reasonable manner, taking into account important operational and safety criteria related to military aircraft operations. Administrative Record ("AR") 29572–77. The court finds that the Navy's development of screening criteria was a reasonable interpretation of the 1995 BRAC report. The Navy also viewed the 1995 BRAC report as requiring the Navy to fully utilize the excess capacity at NAS Oceana, making it both reasonable and necessary to include NAS Oceana as part of every alternative. The 1995 BRAC recommendations specifically mention twice the excess capacity at NAS Oceana and lists NAS Oceana at the top of the list of air stations with the "necessary capacity and support infrastructure," to handle the transfer of aircraft from NAS Cecil Field. Defense Base Closure and Realignment Commission, 1995 Report to the President, at 1–50. Furthermore, it is undisputed that NAS Oceana had significantly more excess capacity available than MCAS Beaufort and MCAS Cherry Point combined. NAS Oceana had sufficient excess hangar capacity to accommodate eight fleet squadrons, FEIS at 2.2–15, while MCAS Beaufort and MCAS Cherry Point together could only accommodate five fleet squadrons. FEIS at 2.2–19; *id.* at 2.2–26. Accordingly, the Navy's interpretation of the 1995 BRAC report was reasonable and the Navy did not act arbitrarily and capriciously by including NAS Oceana in every ARS.

## B. Adequacy of the FEIS

### 1. Alternatives Analysis

■ Plaintiff first claims that the FEIS is fatally flawed because the Navy did not conduct a searching inquiry into alternatives as required by NEPA. *See Natural Resources Def. Council v. United States Dep't of Navy,* 857 F.Supp. 734 (C.D.Cal. 1994). Plaintiff challenges the alternatives analysis on a number of specific grounds. Initially, plaintiff faults the Navy for considering NAS Oceana as the only single-site option. Plaintiff claims that the Navy was unreasonable in its decision not to examine single-siting the aircraft at either MCAS Beaufort or MCAS Cherry Point. Plaintiff also argues that none of the scenarios contemplated placing less than fifty percent of the aircraft at NAS Oceana.

Contrary to plaintiff's assertion, the FEIS makes it quite clear that these options were considered by the Navy. However, the FEIS also indicates that these alternatives were eliminated from detailed analysis because of either the mandates contained in the 1995 BRAC report, or the Navy's operational requirements. *See*

FEIS at 2.6-1 to 2.6-8 (describing alternatives considered but rejected for detailed analysis and discussing the reasons for elimination).

With regard to single-siting at locations other than NAS Oceana, as the Navy correctly points out, single-siting the F/A-18s at MCAS Cherry Point was foreclosed by the BRAC process. This single-site option was the specific recommendation of the 1993 BRAC report, despite the fact that the relocation would involve significant construction at MCAS Cherry Point due to the lack of excess capacity there. Two years later, though, the 1995 BRAC report specifically disavowed the MCAS Cherry Point single-site option precisely because of the excess capacity issue. Thus, as concluded above, the Navy's decision not to consider this alternative for detailed analysis was not only reasonable, but was also virtually mandated by law.

Likewise, the Navy's decision not to consider any form of single-siting all the F/A-18s at MCAS Beaufort was also based on a reasonable interpretation of the 1995 BRAC report. The 1995 BRAC report specifically mentioned the significant excess capacity available at NAS Oceana due to the accelerated retirement of A-6s previously based there. The report further emphasized the importance of NAS Oceana as a result of this excess capacity by listing it first in the list of illustrative alternatives for receiving the F/A-18s. The Navy argues that single-siting the F/A-18s at MCAS Beaufort would leave all of the excess capacity at NAS Oceana unused. As noted earlier, it is undisputed that NAS Oceana has far more excess capacity than MCAS Beaufort and MCAS Cherry Point combined, much less MCAS Beaufort alone. Given these facts, in addition to the fact that the court has already

found the Navy's interpretation of the 1995 BRAC report to be reasonable, the court finds that the Navy's decision to consider only NAS Oceana as a single-site alternative was not arbitrary and capricious.

In fact, the Navy's reasonable interpretation of the 1995 BRAC report also supports the decision to include NAS Oceana as part of every ARS developed. By far the overriding criteria in using NAS Oceana under every ARS was the fact that it had the most excess capacity and support infrastructure of the three air stations that survived the screening process, which process is not challenged by plaintiff.

Plaintiff next argues that the Navy erred by not considering any alternatives that placed less than fifty percent of the aircraft at NAS Oceana. Again, however, given the amount of excess capacity present at NAS Oceana, the Navy's alternative analysis was consistent with the 1995 BRAC report, and, therefore, reasonable.[4] The Navy, contrary to plaintiff's assertions, also considered dividing the aircraft between the three bases. This alternative was rejected for detailed analysis because, although utilizing excess capacity at all three bases, it resulted in prohibitively high costs. AR 29578; FEIS at 2.6-3 to 2.6-6. The triple-basing alternative would have required separate maintenance and training facilities at all three bases, resulting in significant one-time costs. FEIS at 2.6-5. In addition, there were also problems related to operational readiness because the East Coast F/A-18 community would be widely dispersed, resulting in a loss of the synergy that occurs when all the squadrons in a particular community are located together, as the F/A-18s were at NAS Cecil Field. FEIS at 2.6-6. For similar training and operational reasons, the Navy also decided that no alternative

4. Plaintiff attempts to find fault with the Navy's analysis by arguing that under every ARS developed by the Navy, excess capacity at either MCAS Beaufort or MCAS Cherry Point is unused. This argument, however, is completely inconsistent with the alternatives proposed by plaintiff which either do not use

all of the excess capacity at one *or more* bases (single-siting at MCAS Beaufort or MCAS Cherry Point, or the "NAS Beaufort" alternative), or leave a more substantial amount of excess capacity than under the ARSs proposed by the Navy (siting less than fifty percent at NAS Oceana).

should be pursued that resulted in the separation of the Fleet Replacement Squadron ("FRS") from the majority of the active duty squadrons. FEIS at 2.6–6 to 2.6–8. The findings in the FEIS are amply supported by the administrative record, which indicates that the Navy reviewed three separate triple-siting possibilities with onetime costs ranging from $101 million to $233 million.[5] AR 29588–96. Moreover, the administrative record also reveals that no Navy tactical jet aircraft has ever been based at three separate locations, with the attendant tripling of support personnel and equipment costs, maintenance costs, and operational complexities. AR 29598–602. The Navy was reasonable in not considering the triple-siting alternative in the FEIS.

Plaintiff also claims that the Navy erred in its development of alternatives by relying exclusively on cost considerations and not accounting for environmental considerations. In this regard, plaintiff first claims that the Navy failed to consider other "reasonable" alternatives that complied with the BRAC mandates while also having a less adverse effect on the environment than any of the ARSs developed by the Navy. In particular, plaintiff claims that the Navy should have considered consolidating the Marine Corps aircraft from MCAS Beaufort to MCAS Cherry Point, and then moving the F/A–18s to what would then be called "NAS Beaufort." Plaintiff claims that this plan also utilizes all of the excess capacity at two of the three air stations, while also substantially reducing the environmental impact in the areas around NAS Oceana and NALF Fentress, where more people are affected by higher noise levels than around the other two bases.

As the administrative record reveals, this alternative was also considered during the preparation of the EIS. AR 29735; AR 24196. After the publication of the DEIS, plaintiff questioned the Navy about the possibility of this "NAS Beaufort" alternative. As the FEIS reveals, the Navy rejected this alternative because the BRAC process did not give the Navy the authority to create capacity by shifting assets between bases. FEIS at 2.6–8. The Base Closure Act limits the applicability of NEPA to actions taken as part of the BRAC process. In particular, the Base Closure Act states that when applying NEPA as part of the BRAC process, the Navy does not have to consider "military installations alternative to those recommended or selected." Base Closure Act, § 2905(c)(2)(B)(iii). The Navy relies on this section for its rejection of the "NAS Beaufort" alternative. Under the Navy's interpretation, the complex rearrangement of aircraft assets between bases, along with the redesignation of bases, was the exclusive purview of the 1995 BRAC commission. The Navy's mandate under the 1995 BRAC report with respect to the F/A–18s was to identify a receiving base for the relocation, and did not contemplate moving Marine Corps aircraft from one base to another in an effort to create capacity to receive the F/A–18s. Adding increased weight to this argument is the very specific language in the 1995 BRAC report discussing the excess capacity available at NAS Oceana. Implementation of the "NAS Beaufort" alternative would leave the excess capacity at NAS Oceana unutilized. Accordingly, the court finds that the failure to fully analyze the "NAS Beaufort" alternative proposed by plaintiff was not arbitrary and capricious, but, instead, was based on reasonable interpretations of the Base Closure Act and the 1995 BRAC report.

■ Finally, plaintiff claims that the Navy did not consider environmental factors as it developed the ARSs. Plaintiff, however, does not direct the court to any statutory, regulatory, or case law authority that requires an agency to take environmental factors into account in the develop-

---

**5.** These estimates were the costs required over and above the costs of the "baseline scenario," which placed all the F/A–18 aircraft at NAS Oceana.

ment of alternatives. The Navy correctly points out that to require detailed consideration of environmental factors during development of alternatives would lead to a *reductio ad absurdum.* Essentially, plaintiff's argument would require the Navy to complete a separate EIS in order to determine the alternatives to be included in the actual EIS. The NEPA process is not designed to ensure that the most environmentally friendly alternatives are presented to the decisionmaker. Instead, when correctly done, NEPA presents the environmental impact of the chosen alternatives to the decisionmaker so that he may be properly informed of the environmental consequences of his action. 40 C.F.R. § 1502.14.

Plaintiff claims that because environmental impact was one of the selection criteria for the BRAC process, the Navy was also required to use it in selecting alternatives. This argument fails to account for the fact that the BRAC Commission was not subject to the provisions of NEPA in selecting facilities to receive relocating functions or assets. Base Closure Act, § 2905(c)(1). Moreover, environmental impact was only one of eight criteria that the Commission could use in selecting installations to close or to receive relocated functions. Memorandum in Reply to Defendants' Brief in Opposition to Motion for Preliminary Injunction and in Answer to Motion for Summary Judgment, Exhibit 8, at 1.[6] Therefore, to the extent that the Navy's selection of alternatives is analogous to the Commission's responsibility to select installations to receive assets, the Navy is entitled to use operational, nonenvironmental criteria in selecting the receiving site for the F/A–18s.

The more important point to be made in this regard, however, is the role of the Navy in selecting alternatives and the role of the BRAC Commission are not analogous. Environmental impact was included as a selection criteria for the Commission

precisely because its selection decisions with regard to closure and realignment were not subject to NEPA. The same is not true of the Navy, even when, in this case, it is basically carrying out a function delegated by the Commission. The key difference is that the Navy's selection of alternatives is ultimately subject to the exhaustive requirements of NEPA. Thus, it is not important that the Navy used only operational criteria in arriving at the alternative scenarios. Instead, the important fact is that, once developed, the alternatives were subjected to an environmental impact analysis whose comparative results were used to ensure that the decisionmaker was properly informed as to the results of his decision.

## 2. Noise Analysis

■ Plaintiff expends a great deal of effort in disputing the noise analysis contained in the FEIS. Plaintiff describes the adverse noise effects in great statistical detail. To list some examples, plaintiff describes the large increase in flight operations, both day and night, near NAS Oceana and NALF Fentress from 1997 to 1999 as a result of the relocation; the significant increases in the number of residents in high noise zones; the increase in the number of public schools located in high noise zones; the huge increases, in some cases as much as 300%, in average perceived sound loudness in the twenty-two public schools located within the high noise zones; and the specific and detailed increase in decibel ("dB") level at each school in the high noise zones. The problem with this approach is that every single number cited by plaintiff comes *directly from the FEIS.* Thus, it is clear that the FEIS more than adequately informed the decisionmaker of the *significant adverse* noise consequences for the human environment resulting from the relocation of F/A–18s to NAS Oceana. Plaintiff's noise arguments basically constitute a dispute over

---

**6.** Exhibit 8 is a portion of the Executive Summary of the Defense Base Closure and Rea-

lignment Commission 1995 Report to the President.

non-material matters, *Dubois v. Department of Agric.*, 102 F.3d 1273, 1287 (1st Cir.1996) (stating that agency action should not be disturbed based on "inconsequential or technical deficiencies"), or matters best left to agency discretion. *See Valley Citizens for a Safe Env't v. Aldridge,* 886 F.2d 458, 469 (1st Cir.1989) (Breyer, J.) (stating that it is within the agency's discretion "to determine proper testing methods").

The FEIS analyzes noise effects in considerable detail. For each of the three air stations examined in the ARSs, the Navy developed noise contours based on projected air operations at each field following the relocation. The Navy then compared these contours with historical noise contours at each field. For instance, for NAS Oceana, the Navy compared the post-relocation contour ("the 1999 noise contour") with a noise contour developed from known air operations at the field in 1997. The Navy also compared the 1999 noise contours with the contours contained in the 1978 Air Installation Compatible Use Zone ("AICUZ"), which was developed as part of a program established in the 1970s to address community noise and safety impacts.[7] By comparing each of these sets of contours around NAS Oceana, the Navy determined the increase in population living within the new, 1999 noise contours compared to the older noise contours.[8]

According to plaintiff, the Navy's noise analysis erred in two respects, resulting in an understatement in the FEIS of the number of people affected by the increase in area covered by Noise Zone Two (65 to 75 dB Ldn[9]) and Noise Zone Three (75 dB Ldn or greater). Plaintiff first faults the Navy for using 1990 census data in its noise study when more accurate 1996 population data was available for the City of Virginia Beach. Plaintiff also claims that the noise contours themselves are erroneous because they fail to consider deviations from flight patterns and do not count certain types of aircraft operations, such as air show practices, helicopter operations and transient aircraft operations.

As the Navy correctly points out, although the administrative record indicates that 1996 population data was available for Virginia Beach and Chesapeake, there is no indication that comparable figures were available for the geographic areas around MCAS Beaufort and MCAS Cherry Point. Without such information, the Navy could not reasonably carry out an accurate comparison between the noise effects on the three sites as NEPA requires. In addition, by not providing any estimates of the comparable population figures for 1996 around MCAS Beaufort and MCAS Cherry Point, plaintiff is unable to point to any environmental significance accruing to the Navy's failure to use available 1996 population figures for Virginia Beach. Moreover, use of the 1996 Virginia Beach and

7. The AICUZ contours for each air station were developed in different years, but the Navy conducted a proper comparative analysis despite this disparity because the Navy also developed 1997 contours for each station. The comparison of the 1999 noise contours with the 1997 contours provided a consistent basis of comparison between the three air stations. The Navy's comparison of the 1997 contours and the older AICUZ contours at each station was provided merely to demonstrate the historical change in operations at each air station.

8. For NAS Oceana and NALF Fentress under ARS 2, the Navy determined that there would be 45,852 more people within Noise Zone Two (65 to 75 dB) in 1999 than in 1997, but

only 18,486 more people than in 1978. For Noise Zone Three (75 dB or greater), there would be 46,781 more people exposed to that level of sound in 1999 than in 1997, but, again, only 14,668 more people than in 1978. The greater difference between 1999 and 1997 compared to 1999 and 1978 is attributable to a substantial decrease in flight operations between 1978 and 1997 as a result of the retirement of the A-6 aircraft that were based at NAS Oceana until 1996.

9. Ldn is the day-night average sound intensity averaged over a twenty-four hour period. As even plaintiff acknowledges, Ldn "is used to define sound level contour, i.e. Noise Zones." Plaintiff's Opening Brief at 17 n. 9.

Chesapeake population numbers, without comparable data for the areas surrounding the other two air stations, exaggerates the already large difference in affected population between areas around NAS Oceana/NALF Fentress and MCAS Beaufort or MCAS Cherry Point. The court finds that the Navy's consistent use of 1990 census figures in the FEIS was reasonable, and accurately represented the scope and magnitude of the difference in noise effects on the areas surrounding each air station. *See Citizens Comm. Against Interstate Route 675 v. Lewis*, 542 F.Supp. 496, 554–55 (S.D.Ohio 1982) (holding that it is reasonable to use old population data, even when more recent numbers are available, absent some showing of environmental significance of failure to use more recent data); *Minnesota Pub. Interest Research Group v. Adams*, 482 F.Supp. 170, 176 (D.Minn.1979) (same).

Likewise, the court finds that plaintiff's arguments regarding the size of the 1999 noise contours are unfounded. Plaintiff argues that the aircraft landing patterns used in the noise contour analysis are too difficult to be flown by pilots flying in and out of NAS Oceana, resulting in substantial deviations from flight path centerlines and an expansion in the actual sound contours. However, this argument is belied by plaintiff's own evidence. At the January 13, 1999, hearing on the preliminary injunction, plaintiff offered the testimony of one of its members, Herbert A. Stokely, a retired Navy pilot who had flown in and out of NAS Oceana while on active duty at NAS Norfolk. Stokely testified on direct examination that "aircraft can indeed fly the patterns at [NAS] Oceana." Stokely also testified that an aircraft could "easily" stay within the flight patterns that were used in the noise analysis and for the development of Accident Potential Zones ("APZs"). Stokely also admitted that a possible reason for the difference in the size of the patterns flown at NAS Oceana

and NALF Fentress is the fact that there are typically more aircraft in the landing pattern at Fentress than at Oceana, because of the Field Carrier Landing Practice ("FCLP") that occurs at NALF Fentress.

The FEIS also addressed plaintiff's contention directly. The FEIS recognizes the aircraft will not always fly on the centerline used to conduct the noise analysis. Instead, "[a]ctual patterns may vary due to type of aircraft, aircraft weight, aircrew technique, number of aircraft in the pattern, wind, etc." FEIS at 3.1–1. Moreover, unlike plaintiff's argument, the FEIS does not limit these reasons to differences that will occur only at NAS Oceana. Instead, because these are variables that occur at every airfield, it is clear to the court that, to the extent there will be some minor differences in the actual noise contours compared to the model contours, the differences will also occur at MCAS Beaufort and MCAS Cherry Point.[10] In this regard, plaintiff's repeated emphasis on the adverse environmental effects at NAS Oceana is misplaced. The important point for determining whether the FEIS was arbitrary and capricious is that the same methodology was used at each airfield, allowing the same variables to occur at each location. NEPA does not impose a requirement that the environmental impact analysis be perfect, only that the decisionmaker has sufficient information to accurately compare the environmental effects of the various alternatives. *Dubois*, 102 F.3d at 1287. Here, by using the same methodology to arrive at the noise contours at each air station, and recognizing that there are uncontrollable variables that will not allow the actual contours to mirror the ideal, the FEIS properly represented the relative impact of increased noise on the populations surrounding the three air

---

10. The testimony of Mr. Stokely did not take these variables into consideration. Instead, his testimony concerned the feasibility of flying the centerline pattern in the absence of these variables.

stations.[11]

Plaintiff next claims that the noise analysis methodology employed in the FEIS did not accurately portray the noise effects on the areas surrounding the air stations. Specifically, plaintiff questions the Navy's heavy reliance on the day-night average sound level metric (Ldn). Plaintiff claims that the use of Ldn does not accurately portray the noise impact on the population and sensitive noise areas, such as public schools and churches. According to plaintiff, using averages, such as Ldn and Leq,[12] does not account for the noise impact resulting from single noise events. Instead, plaintiff claims that the FEIS analysis should have focused more on the noise impact of single noise events by using the Sound Exposure Level ("SEL") metric. Plaintiff also faults the FEIS for failing to discuss the impact of sound levels associated with single noise events on education and learning in the schools located near NAS Oceana and NALF Fentress, as well as the disruption of sleep patterns.

Courts have consistently held that the choice of scientific methodology used in an EIS is within the sound discretion of the agency. *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 578 (9th Cir. 1998); *Communities, Inc. v. Busey*, 956 F.2d 619, 623 (6th Cir.1992); *Sierra Club v. United States Dep't of Trans.*, 753 F.2d 120, 128 (D.C.Cir.1985). More precisely, numerous courts have approved the use of the exact sound methodology used in this case, while rejecting the exact argument that plaintiff makes here. *Morongo Band of Mission Indians*, 161 F.3d at 578 (approving use of Ldn methodology and re-jecting argument that FAA was required to consider single-event noise levels); *Communities, Inc.*, 956 F.2d at 623 (holding that there was no requirement for FAA to go beyond the Ldn cumulative noise impact methodology); *Valley Citizens*, 886 F.2d at 468–69 (acknowledging that the cumulative impact methodology is the standard methodology used by all federal agencies, mainly because there is no other viable methodology that yields as complete a picture of the overall noise impacts); *Sierra Club v. United States Dep't of Trans.*, 753 F.2d at 128 (rejecting argument that failure to use single event noise analysis instead of, or in addition to, cumulative noise methodology was unreasonable). Therefore, plaintiff has failed to demonstrate that the Navy's "decision to rely on average noise levels, rather than single-event noise impacts, was arbitrary or capricious." *Morongo Band of Mission Indians*, 161 F.3d at 579.

### 3. Cost–Benefit Analysis

Plaintiff claims that any cost-benefit analysis based on the information contained in the FEIS was erroneous because the FEIS, while it projected enormous economic benefits to the communities surrounding NAS Oceana and NALF Fentress, failed to disclose significant costs to the community. Specifically, plaintiff claims the Navy knew that residential and school attenuation costs were upwards of $1.6 billion, but refused to disclose this fact in the FEIS. Plaintiff also claims that the Navy failed to adequately disclose and discuss the adverse economic impact of aircraft noise on property values.

---

11. Plaintiff's argument that the noise contours are not accurate because the FEIS fails to account for certain irregularly staged events, such as air show practices and transient aircraft operations, fails for much the same reason. These irregular, hard to track operations were not included in the analysis at any of the air stations. Moreover, as the Navy correctly points out, it is unclear that they occur with sufficient frequency as to cause a significant impact on the noise analysis.

12. Leq is the equivalent noise level metric for a portion of the twenty-four hour period measured by the Ldn noise metric. As used in the FEIS, Leq measured the average sound level during the school day from 7:00 a.m. to 4:00 p.m. FEIS at 4.8–4. Use of Leq presented a more accurate picture of the sound levels experienced in public schools because the 10 dB penalty for nighttime flights was then not considered.

With respect to the question of attenuation costs, the Navy raises a two-fold argument. First, the Navy argues that because it does not have authority to expend federal funds on private and local government mitigation projects, there is no requirement to discuss those costs in the FEIS. The Navy correctly points out that plaintiff supports its argument with an improper analogy to the FAA. The FAA has received authority from Congress to expend federal funds on noise mitigation at private residences and sensitive noise receptors as part of the FAA's consideration of airport construction or expansion projects. Unlike the FAA, the Navy has no such authority. Thus, the Navy properly concluded that when no federal funds would be expended in private mitigation efforts, there was no need to include those costs as part of its cost-benefit analysis. *See Methow Valley Citizens Council*, 490 U.S. at 352–53, 109 S.Ct. 1835 (holding agency did not have to submit fully developed mitigation plan or receive assurance that mitigation would occur before proceeding with proposed action where mitigation measures were completely within jurisdiction of state and local govern-

ments). That said, however, the Navy did not completely ignore the consequences of the transfer of the F/A–18s on the local community.

The FEIS explicitly acknowledges that the transfer will have a significant noise impact on the surrounding community. FEIS at 4.8–1. The FEIS also thoroughly examined the noise impact on sensitive noise receptors such as public schools. FEIS at 4.8–4 to 4.8–9. The Navy even used the FEIS to suggest a number of methods that the local community could mitigate the noise impact, and also indicated its plan to work with local community officials to conduct surveys of the noise impacts at local schools. FEIS at 4.8–4.

Second, the Navy argues that the FEIS properly excluded consideration of mitigation costs to private homeowners because such costs were too speculative. The Navy claims the costs were speculative because there was no way of determining how many homeowners would actually undertake mitigation.[13] It is also uncertain whether all of the homes in question would even require additional sound attenuation.[14] The cases the government relies on

13. Plaintiff relies heavily on the fact that the Chief of Naval Operations ("CNO") was given an analysis that indicated the sound attenuation costs for the approximately 33,948 single-family homes experiencing noise impacts greater than 65 dB would average $30,000 per residence. AR 50501. The analysis also indicated that school attenuation costs would average $1.5 million per school. *Id.* However, plaintiff's use of these numbers is taken out of context. The memorandum prepared for the CNO was a comparison of Navy and FAA policies on noise mitigation. The memorandum clearly states the same Navy policy discussed in the FEIS, namely that the Navy, while encouraging attenuation efforts by local communities, does not have, and has never sought, Congressional authority to fund community sound attenuation. FEIS at 4.8–4. By way of contrast, the memorandum then discusses the FAA's federally-funded mitigation plan, which allows a homeowner to obtain Federal Airport Improvement Funds for seventy-five to ninety percent of noise mitigation costs, with the remainder borne by the (private) airport operator. *Id.;* AR 50502–06

(overview of FAA's Airport Noise Compatibility Program attached to CNO memorandum). The numerical analysis section follows the section on mitigation measures available to the FAA, and is clearly a worst case estimate of attenuation costs that would occur if the Navy had the same kind of authority as the FAA to provide federal funds for sound attenuation. NEPA, however, does not require agencies to conduct a worst case analysis, especially for mitigation measures outside the agency's control. *Methow Valley Citizens Council*, 490 U.S. at 354, 109 S.Ct. 1835.

14. It would be well-nigh impossible for the Navy to determine how many of the over 33,000 homes would require sound attenuation. This is not a case of a new airfield being constructed or an older field undergoing significant expansion, such that residences and other buildings are being affected for the very first time. Instead, NAS Oceana has existed for over four decades. Much of the growth and development around NAS Oceana occurred in the last twenty years, a time when, as the 1978 AICUZ contours dem-

to support this argument, though, simply state that NEPA does not require an agency to discuss speculative environmental impacts. *See, e.g., Dubois*, 102 F.3d at 1286; *Environmental Def. Fund, Inc. v. Hoffman*, 566 F.2d 1060, 1067 (8th Cir. 1977). Here, the noise impact is not speculative, but is, in fact, quite well known. At the same time, the Navy's reading of these cases for the broader proposition that NEPA does not require discussion of speculative mitigation costs resulting from the known noise impact appears to be correct, given the insurmountable difficulty of calculating those costs,[15] *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 290 (4th Cir.1999) ("the mere fact that certain factors in a cost-benefit analysis are generally imprecise or unquantifiable does not render the result inadequate"), and the fact that there is no requirement that a complete mitigation plan be developed when the means and authority to mitigate are outside the agency's purview. *Methow Valley Citizens Council*, 490 U.S. at 352–53, 109 S.Ct. 1835. As a result, the court finds that the Navy did not act arbitrarily or capriciously in failing to discuss the costs of private and local government sound attenuation.

· With respect to plaintiff's property value argument, the Navy again claims it was not required to discuss the impact of the aircraft transfer on property values because, as with the mitigation costs, determining the impact is too speculative. *See Town of Norfolk v. EPA*, 761 F.Supp. 867, 887 (D.Mass.1991) (holding that the failure to place a dollar value on possible decrease in property value was not unreasonable);

*Olmsted Citizens for a Better Community v. United States*, 606 F.Supp. 964, 974 (D.Minn.1985) (stating that there is no requirement to discuss nonphysical impact such as property values). In this case, not only did the Navy explain the uncertainty surrounding attempts to measure the effect on property values,[16] but plaintiff's own evidence also supports the Navy's argument on this issue.

Plaintiff's rely on an FAA study titled *Aviation Noise Effects*, Report No. FAA–EE–85–2 (Plaintiff's Exhibit 60). The study concluded that noise decreases property values by "only a *small* amount— approximately [one percent] decrease per decibel (DNL)." *Id.* at 101 (emphasis added). The report noted that the loss was equivalent to the cost of moving to a new home. The report went on to state that aircraft noise "is just one of the considerations" affecting the value of a home. *Id.* Among the "many other factors that affect the price and desirability of a residence," are size of house, number of rooms, air conditioning, distance from business district, and the number of lakes, parks, and other· recreational areas nearby. *Id.* at 100–01. Moreover, the report also notes that any negative price effect from aircraft noise is often counterbalanced by having close proximity to the airport for transportation or employment. *Id.* at 99. In this particular case, closeness to NAS Oceana and/or NALF Fentress may indeed be a benefit to service members who move to Virginia Beach or Chesapeake and may be willing to put up with some additional aircraft noise in order to have a short commute to work. In any event, the FAA

onstrate, aviation activity at NAS Oceana was at a fever pitch. It is entirely possible that many of the homes constructed during this time frame were built with sufficient attenuation measures, and there would be no utility in taking any additional mitigation measures.

15. *See supra* notes 13 and 14 and accompanying text.

16. In response to comments on the DEIS, the Navy stated: Property values are determined by a combination of neighborhood characteristics (e.g., the quality of local schools, local property taxes, access to transportation, and the crime rate) and individual housing characteristics (e.g., age of the house, number of rooms, and amenities such as garages). There are no definitive federal standards for quantifying the impact of aircraft noise on property values. Therefore, we cannot quantify whether the increase in noise will affect property values.
FEIS at A–5–118.

report serves to confirm the gist of the government's argument that it is too difficult to evaluate the precise effect of the additional aircraft noise on property values.[17] Accordingly, the court finds that the Navy was not arbitrary and capricious in failing to discuss the impact on property values in more detail.

### 4. Safety Risks

■■■ Plaintiff next asserts that the FEIS inadequately examined the safety risks of the aircraft transfer. Plaintiff claims that, rather than use Accident Potential Zones ("APZs") to measure the safety risk of aircraft crashes, the Navy should have used other criteria such as accidents per operational hour to calculate the probability of an accident occurring in a populated area and the probability of any resulting casualties or damages. Plaintiff also claims the safety analysis in the FEIS fails to make a comparative analysis of the risks associated with each realignment scenario. Plaintiff's arguments, however, fail both as a matter of law and as a matter of fact.

First, the court reiterates that questions of methodology are within an agency's discretion. *See, e.g., Valley Citizens*, 886 F.2d at 469. So long as the method chosen reasonably informs the decisionmaker and the public of potential environmental impacts and allows appropriate comparison between alternatives, the FEIS is adequately prepared. *Id.* at 460. In this case, the Navy chose to use APZs as the vehicle by which it measured the safety risks around the air stations in each rea-

lignment scenario. Rather than use generic aircraft accident rate statistics as argued for by plaintiff, the Navy chose to concentrate its resources on developing a safety analysis for those areas closest to each air station. As the ROD and FEIS both indicate, individuals living within an APZ have a greater risk of being affected by an aircraft accident than those outside APZs. ROD at 9–10; FEIS at 3.1–79. *See* FEIS at Appendix G (detailing methodology used to create APZs) The analysis contained in the FEIS, however, does not stop at such a conclusory allegation. As with the noise contours discussed above, the FEIS also compared the projected APZ contours after the F/A–18s' arrival with the pre-arrival APZ, and concluded that there would be a significant increase in land area and population within the revised APZ. FEIS at 4.4–3 to 4.4–7; *id.* at Figures 4.4–3 to 4.4–6. Thus, there is no colorable claim that the FEIS failed to adequately inform the decisionmaker of the large population that would be subjected to an increased risk of an aircraft crash as a result of the F/A–18 transfer.

Second, it is not clear to the court that the methodology proposed by plaintiff would result in a more detailed analysis. In fact, it seems likely that plaintiff's proposal would yield a less detailed, therefore less useful, analysis. Plaintiff faults the Navy for not basing its safety analysis on the number of accidents per operational hour. However, no matter what that figure, if the accident per operational hour rate was applied to all of the areas surrounding the air stations, including those

---

17. The difficulty raised by trying to estimate an effect on property values is further compounded by the context of this case. When NAS Oceana was first established decades ago, it was relatively isolated. Only in the last twenty years or so, as plaintiff points out, has there been substantial encroachment on the areas surrounding NAS Oceana. Here, where the airfield existed before a large majority of the affected homes, it would seem that any diminution in value was built into the cost of the home to begin with. Thus, to the extent that the arrival of the F/A–18s will

only cause the noise contours to expand slightly beyond the 1978 contours, it is not clear that the arrival of the F/A–18s will have any effect on property values. If anything, given the fact that the retirement of the A–6 led to a drawdown in personnel at NAS Oceana, it is just as likely that home values will actually increase, not decrease, as the influx of Navy personnel from NAS Cecil Field fuels competition for single family homes in the areas surrounding NAS Oceana and NALF Fentress.

outside APZs, the result would be a uniform, and statistically insignificant, crash probability. In other words, use of such a generic measure applied to a greater area does not account for the fact that a majority of aircraft accidents near airfields occur in the airfield landing and takeoff patterns. This greater risk was not only well-documented in the FEIS, see FEIS at Appendix G, but was also specifically acknowledged by plaintiff. Memorandum in Support of Plaintiff's Motion for A Preliminary Injunction And in Support of Motion for Summary Judgment at 37–38 (discussing placement of shopping mall at dangerous point in NAS Oceana traffic pattern and fact that forty-one percent land use in APZs around NAS Oceana is residential housing).

Plaintiff expends a great deal of effort explaining how the Navy has vigorously opposed encroachment on the NAS Oceana APZs over the last twenty years, especially in 1976 with regards to the construction of a local shopping mall. As plaintiff's brief points out, the mall was located in the landing pattern for NAS Oceana, precisely at a "place where [crashes are] more likely to happen," because "that's where a lot of accidents occur around airfields." *Id.* at 38 (quoting the statement of a former NAS Oceana commanding officer in a local newspaper). Far from pointing out any error in the Navy's methodology, this portion of plaintiff's argument directly supports the importance of the methodology used by the Navy and the significant distinction between areas inside and outside an APZ.

Finally, plaintiff attempts to argue that a supplemental FEIS should be prepared based on the fact that four months after the FEIS was completed, the Chief of Naval Operations reported to Congress that there was an eighty-two percent increase in the aviation mishap rate for the previous year. Plaintiff, however, fails to demonstrate the relevance of this single statistic, taken out of context, to the inquiry before the court. There is no indication whether any portion of the increase was attributable to F/A–18 operations, or where the increase in crashes occurred, i.e., near airfields, over land but not near airfields, or at sea from aircraft carriers. As a result, there is no indication that this "new" information would have any bearing on the safety analysis used by the Navy, which used aircraft crash data over a thirty year period. One anomalous year, which "followed a long-term downward trend in aviation mishaps, reaching a new low [the year before the increase]," Plaintiff's Exhibit 89, at 4 (statement of Admiral Jay L. Johnson, Chief of Naval Operations, before the Senate Armed Services Committee, September 29, 1998), simply has no significant impact on the environmental study conducted by the Navy.

Plaintiff's other arguments on this issue are either contrary to the record or have no merit.[18] Accordingly, the court finds that the FEIS adequately addressed the safety risks of the F/A–18 transfer.

### 5. Air Quality Impacts

 Although plaintiff has raised a number of arguments about the air quality discussion contained in the FEIS, most of those arguments are not relevant to the question before the court.[19] Instead, most

---

**18.** For instance, plaintiff argues that the FEIS failed to reveal the consequences of an aircraft crash near NAS Oceana to the decisionmaker and the public because the FEIS does not discuss the availability of medical care, hospitals, and emergency or disaster assistance to respond to a crash. However, as the Navy points out, the FEIS contains a detailed discussion of fire and emergency services available both on base, and in the Cities of Virginia Beach and Chesapeake, FEIS at 3.1–

107 to 3.1–110, as well as available medical facilities. FEIS at 3.1–112 to 3.1–113.

**19.** Plaintiff's inapplicable arguments are: the FEIS was inadequate because it failed to disclose the amount and impact of air emissions offsets from two Hampton Roads emission sources that were used in the State Implementation Plan and the resulting economic impact of NAS Oceana's use of that offset; the FEIS erred by analyzing the air quality

of plaintiff's arguments, to the extent that they have validity at all,[20] do not indicate a failure to comply with NEPA at all, but, instead, involve compliance with the Clean Air Act, which is not at issue in the current action. NEPA does not impose a requirement on government agencies to comply with the provisions of the Clean Air Act. *See Conservation Law Foundation v. Busey*, 79 F.3d 1250, 1262 (1st Cir.1996) (stating that there is "no connection between NEPA and Clean Air Act compliance"). Under NEPA, an agency is only required to describe and analyze the adverse effects on the human environment. In the air quality context, as long as the FEIS reasonably describes the change in pollutants that will result from a proposed action, and does so without any significant errors, the FEIS is adequate. *Valley Citizens*, 886 F.2d at 467 (holding that omission of over fifty tons of nitrous oxides from air quality analysis was not significant enough to require the Air Force to redo environmental impact study). Essentially, the air pollution described in a FEIS can be well in excess of Clean Air Act limits, but so long as the pollutant amounts were calculated without a significant error, NEPA is satisfied, even though the provisions of the Clean Air Act may not be.

In this case, the plaintiff only raises one argument that challenges the accuracy of the data published in the FEIS. Although not challenging the methodology used in the Navy's air quality analysis, plaintiff claims that the administrative record reveals that changes were made to the model input data, which resulted in a significant decrease in the amount of ozone precursor emissions. However, other than picking isolated spots in the administrative record that discuss possibly changing an assumption related to the input data, plaintiff fails to demonstrate error in the use of the changed assumption or the ultimate result. Plaintiff's selective use of the administrative record fails to recognize that the Navy was continually refining its methodology in order to ensure the most accurate emissions estimate. Plaintiff would lead the court to believe that the refining process only yielded one result: a decrease in the emissions amount. A glance at the very portions of the administrative record relied on by plaintiff is sufficient to demonstrate that, in fact, it was a two-way ratchet, because some of the changed input data actually led to increases in pollutant emissions. *See* AR 21521 (stating that there needs to be differentiation between different engines used in two versions of the F–14 because of different fuel emission rates, and the one used in early analysis had lower emission rate); AR 21522 (stating that emission indexes for E–2 aircraft, which conduct FCLPs at NALF Fentress, were low and offering higher, corrected numbers; stating that number of touch and go approaches appears low); AR 21523 (stating that Time in Mode figures used for E–2 aircraft were low, with correction resulting in increase in emissions); AR 29962 (stating that after adjustment of air-to-air/air-to-ground mission ratios, there was an increase of sixty flights over

impact on the Hampton Roads Air Quality Control Region, and not the area immediately surrounding NAS Oceana and NALF Fentress; and the FEIS does not discuss the consequences of more restrictive air quality standards recently approved by the EPA.

20. For example, regulations promulgated as a result of the Clean Air Act specifically permit the use of offsets to determine conformity with State Implementation Plans. 40 C.F.R. § 93.158(a)(2). Thus, plaintiff's argument on this point is meritless. Likewise, plaintiff's argument with respect to the Navy's failure to conform to more restrictive air quality standards recently approved by the EPA is without merit, given the uncertainty surrounding the eventual implementation of those standards. *See American Trucking Ass'ns, Inc. v. United States EPA*, 1999 WL 300618, at *27 (D.C.Cir. May 14, 1999) (holding that EPA was arbitrary and capricious in selection of portion of the new standards for coarse particulate matter and remanding case to the EPA "for further consideration of all standards at issue" in light of panel majority's holding that EPA's construction of Clean Air Act constituted unconstitutional delegation of legislative power).

eighteen month workup period). Moreover, it is not clear to the court that any of the changed assumptions cited by plaintiff were erroneous. *See, e.g.,* AR 29961 (stating that the number of nighttime FCLP passes needed to be reduced from eight to six because of fuel constraints resulting from the longer nighttime FCLP pattern; number of daytime passes remained eight); AR 43242 (stating that overhead break to landing was not included in air emissions analysis because comparable numbers were not available for 1993, which was the base year for comparison).

A fair reading of the administrative record indicates that over the two-year period leading up to publication of the FEIS, the Navy made an extensive effort to ensure the correctness of its air emissions analysis. The fact that there were changes in assumptions and model input data is only to be expected where the pieces of information required to put the air quality study together had to be gathered from many different places in a far-reaching, large organization, such as the Navy.

■ Plaintiff has not conducted the type of analysis required to carry its burden of proof on this point. The burden on plaintiff is not just to point out possible errors in the agency's assumptions and methodology, but to demonstrate how and why the FEIS was erroneous. *See Conservation Law Foundation v. Andrus,* 623 F.2d 712, 719 (1st Cir.1979) (requiring a defect in an environmental impact statement to be demonstrated before court will review sufficiency of defect). Only after such a demonstration can the reviewing court determine whether the alleged error in the FEIS was significant enough to find that the agency acted arbitrarily or capriciously. *See Valley Citizens,* 886 F.2d at 463. Plaintiff has simply not alleged any such defect in this case.

Finally, plaintiff argues that, even if the Navy's conformity analysis is accurate, the FEIS failed to discuss the health effects of an increase in emissions on the population surrounding NAS Oceana and NALF Fentress. Plaintiff, without citation to any supporting authority, claims that it is not enough that the Navy demonstrate compliance with the air quality standards established by the Clean Air Act, but must also separately analyze any potential health effects on the local population. However, given the purpose and structure of the Clean Air Act, such an analysis appears to be obviated, where, as in this case, a proposed action is in conformity with the maintenance plan for an attainment area.

The purpose of the Clean Air Act is "to protect and enhance the Nation's air quality, to initiate and accelerate a national program of research and development designed to control air pollution, to provide technical and financial assistance to the States in the execution of pollution control programs, and to encourage the development of regional pollution control programs." *Conservation Law Foundation v. Dept. of Air Force,* 864 F.Supp. 265, 273 (D.N.H.1994) (citing 42 U.S.C. § 7401(b)). To this end, the Clean Air Act authorized the EPA to establish ambient air quality standards necessary to "protect the public health." 42 U.S.C. § 7409(b)(1) (1994). As a result, the EPA promulgated National Ambient Air Quality Standards ("NAAQS"), which establish the maximum limits of pollutants allowed in the outside ambient air. The EPA designates air quality control regions around the country as either having attained the NAAQS ("attainment"), not attained the standards ("nonattainment"), or as unclassified because there is not enough information available to make an attainment determination. When an air quality control region reaches attainment status, it is then required to use the State Implementation Plan to maintain attainment.

■ On June 26, 1996, the Hampton Roads Air Quality Control Region was redesignated by the EPA from marginal

nonattainment to attainment for ozone.[21] By this certification, the EPA signified that the air quality standards in the Hampton Roads region were below that which posed any threat to public health. In June, 1997, the EPA approved the state of Virginia's maintenance plan for the Hampton Roads Air Quality Control Region, indicating that the EPA believed that the plan would allow the region to remain below the NAAQS, and, therefore, below the level at which pollutants would form any threat to public health. In the maintenance plan, the state of Virginia specifically provided an emissions allotment for NAS Oceana that included the possibility of moving the F/A–18 aircraft to NAS Oceana. Because the FEIS determined that the emission levels of ozone precursors were well within the allocation provided in the maintenance plan, the relocation of the F/A–18 aircraft would not return the Hampton Roads Air Quality Control Region above a level posing a threat to public health. As a result, there was simply no health risk for the Navy to discuss in the FEIS. Accordingly, the court finds that the Navy did not act arbitrarily or capriciously in failing to discuss the health effects of the additional pollutants given the fact that the air impact analysis indicated that the proposed action was in conformity with a state maintenance plan for an area in attainment status for all the relevant pollutants.

### 6. Mitigation Measures

Plaintiff also argues that the FEIS failed to adequately address potential means of mitigating the adverse environmental consequences of moving the aircraft to NAS Oceana. Specifically, plaintiff asserts that the Navy failed to examine and discuss the feasibility of constructing an additional outlying airfield for NAS Oceana. According to plaintiff, a new outlying airfield would result in a substantial decrease in air operations, and their attendant noise, safety, and air quality impacts, around NAS Oceana. Plaintiff also faults the FEIS for failing to fully discuss possible noise mitigation that could be accomplished through a complete review of flight procedures at NAS Oceana and NALF Fentress.

■■■ Because NEPA requires agencies to examine the adverse environmental effects of proposed actions, there is an implicit requirement that the FEIS also discuss efforts to avoid those adverse effects. *Methow Valley Citizens Council,* 490 U.S. at 351–52, 109 S.Ct. 1835. NEPA specifically requires agencies to examine possible mitigation measures in the FEIS. 40 C.F.R. § 1502.14(f); *id.* at § 1502.16(h). However, because NEPA does not require detailed explanations of possible mitigation efforts, there does not need to be a fully-developed mitigation plan presented in the FEIS. *Methow Valley Citizens Council,* 490 U.S. at 353, 109 S.Ct. 1835. In fact, because it is only procedural and not substantive in nature, NEPA does not require agencies to implement any of the mitigation measures discussed in the FEIS. *Id.*

In developing the alternative realignment scenarios, one of the screening criteria used by the Navy was the existence of outlying airfields within fifty nautical miles of the main base. NAS Oceana survived the screening process, in part, because it had just such a field, NALF Fentress, well within the fifty nautical mile limit. As such, plaintiff's argument that the Navy failed to discuss the mitigation that could occur through construction of an additional outlying airfield is misplaced. NAS Oceana already has an outlying airfield for conducting the noisy and repetitive field carrier landing practices required before deployment aboard aircraft carriers. Plaintiff would have the Navy discuss building a second outlying field near NAS Oceana, a requirement that is not imposed on any of the other air stations discussed in the FEIS. As a result, the court finds that the Navy was not

---

**21.** The Region was already in attainment for all other pertinent pollutants.

arbitrary and capricious for failing to discuss the possibility of constructing a second outlying field as a mitigation measure for NAS Oceana.

■ The court also finds no error in the Navy's discussion of noise mitigation measures at NAS Oceana. Contrary to plaintiff's assertion, the FEIS clearly indicates that the Navy did, in fact, completely review flight operations and procedures at NAS Oceana. FEIS at 4.8–12.[22] From this review, the Navy developed a number of very specific mitigation measures that it implemented at NAS Oceana, including the elimination of engine maintenance runs after 11:00 p.m., changes in takeoff procedures and late-night arrival procedures, and establishing a navigational aid at NALF Fentress to aid pilots in flying the FCLP pattern there. FEIS at 4.8–13. The FEIS also identified additional mitigation measures that would be undertaken in the event that the recommended ARS (ARS 1) was selected. FEIS at 4.8–14.

Accordingly, the court finds that the FEIS adequately discussed possible mitigation measures that could be undertaken at NAS Oceana.

### 7. Environmental Justice

■ In accordance with Executive Order 12898, the Navy conducted an environmental justice analysis of the realignment scenarios and included this analysis in the FEIS.[23] Plaintiff contends that this analysis was flawed because the Navy used different population figures in the environ-

mental justice portion of the FEIS than it did in the FEIS section on noise impacts. However, NEPA does not require an environmental justice analysis, and, as the Navy correctly points out, Executive Order 12898 specifically states that any agency actions taken pursuant to the provisions of the Order are not subject to judicial review. Exec. Order 12,898, 59 Fed.Reg. 7,629 (1994) ("This order shall not be construed to create any right to judicial review involving the compliance or noncompliance of the United States, its agencies, its officers, or any other person with this order."); see Morongo Band of Mission Indians, 161 F.3d at 575. Because the court does not have jurisdiction to review this portion of the FEIS, the merits of plaintiff's argument are not addressed.

### 8. Cumulative Impacts

When designing the scope of the environmental impact study, an agency must include cumulative actions, which are those that "when viewed with other *proposed* actions have cumulatively significant impacts." 40 C.F.R. § 1508.25(a)(2) (emphasis added). Significant cumulative impacts occur if the current action, when added to past, present, and reasonably foreseeable future actions, results in significant adverse effects on the human environment. 40 C.F.R. § 1502.22; *id.* at § 1508.7 (defining "cumulative impacts"). When evaluating cumulative impacts, the agency must clearly indicate any incomplete or unavailable information that prevents a complete

22. The FEIS states that the Navy conducted a complete review of aircraft arrival and departure procedures, airfield hours of operation, pattern altitudes, aircraft power settings, flight tracks, and aircraft maintenance runup times. FEIS at 4.8–12. Other than a blanket assertion that a "bottoms up" review of flight procedures is needed, plaintiff fails to identify any specific areas that the Navy should have examined, but failed to do so. It seems clear to the court that the Navy did, in fact, conduct exactly the type of thorough review of flight operations sought by plaintiff.

23. Executive Order 12898 states that Federal agencies whenever practicable and appropriate, shall collect, maintain and analyze information on the race, national origin, income level, and other readily accessible and appropriate information for areas surrounding facilities or sites expected to have a substantial environmental, human health, or economic effect on the surrounding populations, when such facilities or sites become the subject of a substantial Federal environmental administrative or judicial action.
Exec. Order No. 12,898, 59 Fed.Reg. 7,629 (1994).

evaluation of the environmental impacts. 40 C.F.R. § 1502.22.

The FEIS at issue here contained a substantial discussion of cumulative impacts. The cumulative impact section specifically examined military and civilian airspace use around the three air stations, personnel relocations as a result of the realignment decision, and general growth trends in the regions around NAS Oceana, MCAS Beaufort, and MCAS Cherry Point. The FEIS also acknowledged that the realignment decision "could be cumulatively impacted" by the replacement of the F/A–18 C/D aircraft being relocated to NAS Oceana, along with the F–14 aircraft currently at NAS Oceana, because "it is reasonably foreseeable" that those aircraft would be replaced by a different series of F/A–18 aircraft, the F/A–18 E/F. FEIS at 9.1–7. However, the FEIS also indicated that if any such proposal was made, it would occur at some unknown time in the future, at which time another EIS would be developed in accordance with NEPA. *Id.* The Navy did not stop its discussion of the E/F at this point, though, but went on to detail some of the expected changes that could result from the E/F aircraft and discuss the reasons why a complete evaluation of the environmental impact was not possible in the current FEIS.

According to the FEIS, as a general matter the E/F aircraft will emit approximately fifty-five percent more nitrous oxides than C/D aircraft under the same operating conditions. FEIS at 9.1–14. Compared to the F–14s, the E/F aircraft will produce twenty-eight percent fewer nitrous oxide emissions. *Id.* However, the FEIS indicates that a complete analysis of the air quality impact of the E/F aircraft was not possible because the future mix of E/F and C/D aircraft at NAS Oceana is unknown. In addition, emission estimates can only be developed for relocation sites after operating mode and time in mode scenarios are developed for each location, which is not yet possible given that the future aircraft mix is unknown. FEIS at 9.1–13. With respect to the possible noise impact of the E/F aircraft, the FEIS did indicate that there would be changes in the noise contours around NAS Oceana and NALF Fentress. Again, however, the FEIS also indicated that the changes could not be precisely predicted because the future mix of aircraft sited at NAS Oceana is still unknown. *Id.* Based on a prototype E/F aircraft, the FEIS stated as a general matter that the E/F is quieter than the C/D version of the F/A–18 and noisier than the F–14. *Id.*

Plaintiff, however, argues that the cumulative impact discussion contained in the FEIS did not adequately address the future impact of the possible E/F replacement action. Plaintiff faults the Navy for not indicating in the FEIS when the E/F replacement is to occur, because plaintiff claims that the administrative record reveals that the E/F aircraft are scheduled to replace the F–14 aircraft beginning in 1999. Plaintiff's Exhibit 106.

■ However, as the government points out, plaintiff has not demonstrated that a formal proposal has been made to purchase and site the E/F aircraft at NAS Oceana. Plaintiff's reliance on programming and budgetary materials is not relevant, as those documents are only projections and, as plaintiff's own evidence demonstrates, are subject to the political process.[24] NEPA does not re-

---

**24.** As part of its reply brief, plaintiff submitted two articles from a Norfolk, Virginia, newspaper, purportedly to demonstrate that NAS Oceana is to be the principal base of the E/F version of the F/A–18. Dale Eisman, *Congressional Critic Starts New Buzz About Super Hornet's Ability*, Virginian–Pilot, Nov. 25, 1998; Dale Eisman, *Navy Suspends Tests of New Fighter Due to Engine Crack*, Virginian–Pilot, Dec. 12, 1998. However, both articles indicate that there are potentially serious performance problems in the F/A–18 E/F. The November 25, 1998, article also makes it clear that Congress has only approved the purchase of sixty-two aircraft so far. The aircraft's performance problems have also led to a certain degree of congressional opposition. For instance, Senator Russ Feingold

quire agencies to examine ethereal possibilities, but only future actions that have actually been proposed. *North Carolina v. FAA*, 957 F.2d 1125, 1131 (4th Cir. 1992). Plaintiff does not contest the government's assertion that the only F/A–18 E/F procurement decision that has been made involves siting the first 164 E/F aircraft purchased at NAS Lemoore in California. In point of fact, plaintiff's criticism of the FEIS in the instant case is premised in part on the fact that the Navy has gone through the NEPA process and published an EIS for the placement of E/F aircraft at NAS Lemoore. The key distinction between the two situations, however, is that the siting of F/A–18 E/F aircraft at NAS Lemoore is a formally proposed action, while there is not yet a formal proposal to site E/F aircraft at NAS Oceana.

■ Given the uncertainties surrounding the future procurement of F/A–18 E/F aircraft, the timing of the F–14 replacement, the eventual mix of C/D aircraft with E/F aircraft at NAS Oceana, and the likelihood that the E/F aircraft will have a minimal impact on the environment,[25] the court finds that the Navy did not act arbitrarily and capriciously in not fully discussing the possible cumulative impact of replacing the F/A–18 C/D with F/A–18 E/F aircraft.[26]

### 9. Compliance With NEPA

■ Finally, Plaintiff asserts that the Navy did not comply with the requirements of NEPA in good faith because, contrary to the contention in the FEIS, the Navy made a decision to send all of the F/A–18s to NAS Oceana before the NEPA process was even started.[27] However, the

asked the Department of Defense to freeze the 1999 appropriation for thirty aircraft until the performance problems are solved. Eisman, *Congressional Critic Starts New Buzz About Super Hornet's Ability*, Virginian–Pilot, Nov. 25, 1998. Thus, at this early stage of the procurement process, it is far from certain that the Navy will acquire the number of F/A–18 E/F aircraft slated to be stationed at NAS Lemoore, much less the number of aircraft that would be required to replace the F–14 and F/A–18 C/D aircraft at NAS Oceana at some unknown point in the future.

25. In arguing that the Navy has considered the environmental impact of the E/F at air stations on the West Coast, plaintiff submitted a copy of "Final Environmental Impact Statement for Development of Facilities to Support Basing U.S. Pacific Fleet F/A–18E/F Aircraft on the West Coast of the United States." (Plaintiff's Exhibit 58). That exhibit states that there will be a "less than significant" noise impact at NAS Lemoore as a result of the arrival of the F/A–18 E/F. The exhibit goes on to state

Because it has a more powerful engine, the F/A–18E/F aircraft can maintain a given set of flight conditions at lower power settings than can existing F/A–18C/D aircraft. The F/A–18E/F aircraft is *quieter* than the existing F/A–18C/D aircraft during takeoffs, climbouts, and high power flight conditions. The F/A–18E/F aircraft is noisier than the existing F/A–18C/D aircraft during

landing approaches and low power flight conditions.

Thus, for half the time around an airfield, the E/F is louder than the C/D and for the other half of the time it is quieter than the C/D, probably resulting in a minimal or zero increase in noise impact in the profiles of the NAS Oceana FEIS.

26. Although the court finds that the FEIS adequately addressed cumulative impacts, even if the court found that the Navy erred, such error would be harmless. The remedy available to the court would be to order the Navy to prepare a supplemental environmental impact statement. However, from the record before the court, it is clear that the Navy is already planning to perform such an analysis in the future. Ordering such an analysis at this time would be duplicative and place an onerous burden on the Navy, one that NEPA does not require. *North Carolina v. FAA*, 957 F.2d at 1131.

27. Defendant's rejoinder to this argument is that the ultimate decision did not, in fact, place all of the F/A–18s at NAS Oceana, but instead split them up between NAS Oceana and MCAS Beaufort (ARS 2). Although claiming that the ultimate decision was made for political expediency, Memorandum in Support of Plaintiff's Motion for a Preliminary Injunction and in Support of Motion for Summary Judgment at 7, plaintiff offers no proof, either inside or outside the administrative record, to this effect.

isolated excerpts that plaintiff cites from the administrative record do not support this contention.

Plaintiff first claims that this argument is supported by a letter written by Senator John Warner of Virginia, in which Senator Warner requests that the move of the F/A–18s to NAS Oceana be expedited. However, Senator Warner is not a Navy official and therefore his statements are not relevant to the state of mind of the Navy decisionmakers. Even if that fact is set aside, though, Senator Warner's letter is not inconsistent with the FEIS. As previously discussed, the 1995 BRAC report clearly indicated that at least some portion of the F/A–18s were going to be transferred to NAS Oceana because it was the base with the most excess capacity. The court has already held that it was reasonable for the Navy to include NAS Oceana as part of all five realignment scenarios. In this respect, Senator Warner's letter was simply an attempt to expedite the movement of whatever F/A–18s were going to be transferred to NAS Oceana.

In any event, the Navy did not bypass the EIS process to expedite the selection process. In fact, as detailed throughout this opinion, the Navy conducted an exhaustive and thorough study of the environmental impact of the F/A–18 transfer, compiling an administrative record in excess of 51,000 pages in the process and issuing a remarkably detailed FEIS filling three large binders.

Plaintiff then focuses on a lone e-mail to prove that the move of all the aircraft to NAS Oceana was preordained. AR 021784. In the e-mail, Brigadier General Braaten told Lieutenant General Brabham that the Navy was sending analysts to collect information at MCAS Cherry Point and MCAS Beaufort for use in the EIS, but that the Navy had no intention of using the Marine Corps' two air stations for the F/A–18s. According to the e-mail, the source for this information was Rear Admiral Lou Smith. Despite the hearsay problem with this document, there is no indication that the Navy had preordained the decision to send all of the F/A–18s to NAS Oceana. None of the individuals mentioned in the e-mail was the agency's final decisionmaker on this issue. At most, this lone e-mail, extracted from an administrative record of over 51,000 pages, merely demonstrates that the Navy had a preferred alternative as it began the FEIS process.

Under NEPA, however, it is often the case that an agency will have a preferred alternative, perhaps even a specific proposal, going into the EIS process. *See* 40 C.F.R. § 1502.2(g); *id.* at § 1502.4(a). In fact, it would be the unusual case for an agency *not* to have such a proposal, because it is often the agency's proposed action that trigger's the NEPA process. *Methow Valley Citizens Council,* 490 U.S. at 349, 109 S.Ct. 1835. In such a case, NEPA only requires that the ultimate decisionmaker remain open to reconsidering any or all aspects of the proposed action based on the environmental impact identified in the FEIS. *See Methow Valley Citizens Council,* 490 U.S. at 351, 109 S.Ct. 1835 ("NEPA merely prohibits uninformed-rather than unwise-agency action"); *Environmental Defense Fund, Inc. v. Corps of Engineers,* 492 F.2d 1123, 1129 (5th Cir.1974) (stating that letters purporting to show agency acted perfunctorily "do not necessarily establish that the ... decision to go ahead with the project would not be reconsidered"). A review of the entire record, and not just a few selective portions cited by plaintiff, reveals that while the Navy may have had a preferred alternative going into the NEPA process, the outcome was not preordained.

In this case, plaintiff points to no evidence in the administrative record indicating that the ultimate decisionmaker, Duncan Holaday, Deputy Assistant Secretary of the Navy (Installations and Facilities), ever concluded before the completion of the FEIS that all of the F/A–18s would be relocated to NAS Oceana. Nor does plaintiff offer any evidence to demonstrate that

the Navy's preferred alternative would not be considered based on any environmental concerns raised in the FEIS. Instead, as defendants contend, plaintiff's argument is utterly refuted by the fact that the ROD did not select ARS 1, the Navy's preferred alternative, but, instead, chose an alternative that allowed the Navy to use MCAS Beaufort's excess capacity and already extant F/A–18 training and maintenance facilities.

The court finds that the Navy conducted a thorough and exhaustive analysis of the environmental impact of the F/A–18 transfer and complied with the requirements of NEPA in all respects.

*IV. Conclusion*

Although plaintiff has engaged in an exercise of "chronic faultfinding," *Coalition for Responsible Regional Development v. Coleman*, 555 F.2d 398, 400 (4th Cir.1977), plaintiff has failed to prove that the FEIS was inadequate in any respect, or that the decisionmaker did not have the information necessary to make an informed decision. Accordingly, the court finds that the Navy's decision to transfer the F/A–18 aircraft from NAS Cecil Field to NAS Oceana and MCAS Beaufort was not arbitrary and capricious. Defendant's cross-motion for summary judgment is **GRANTED** and plaintiff's motion for summary judgment and a permanent injunction are **DENIED**.

The Clerk is **DIRECTED** to send a copy of this Opinion and Final Order to counsel for the parties.

It is so **ORDERED**.